**DURABLE TOY & NOVELTY CORPORA-TION v. J. CHEIN & CO., Inc., et al.**
**No. 148.**

Circuit Court of Appeals, Second Circuit.
Feb. 4, 1943.

Andrew Foulds, Jr., of New York City, for appellants.

John P. Chandler, of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendants appeal from a judgment enjoining them from using the name, "Uncle Sam" or "Uncle Sam's," upon a toy bank, and directing them to account to the plaintiff for profits and damages. The facts are as follows. The business of the plaintiff and of its predecessor (it will not be necessary to distinguish between them), has been and still is the manufacture of toy banks, which since 1907 it has continuously sold under three registered trade-marks, in all of which the most characteristic feature is the words, "Uncle Sam's." The banks have been marketed at between fifty-nine cents and two dollars and a half; that which has had the largest sale contained a registering device which automatically opens the bank when ten dollars have been deposited. The plaintiff has guaranteed all its banks against mechanical defects, has on occasion been called upon to respond, and has always done so. It has advertised very extensively for many years, and the mark may be assumed to have come to indicate to the buyers of. toys for retail dealers generally throughout the country that the plaintiff makes any toy banks which bear it. The defendant, J. Chein & Co., Inc., makes tinware of various kinds, such as pails, dishes and the like; and in the early part of 1941, it added to these a rudely made tin toy bank, in shape and color made to imitate the hat which is part of the accredited costume of the figure, "Uncle Sam." A slit in the top received coins and the bottom was removable to take them out; upon the top was the legend: "Uncle Sam Bank." The retail price of this bank was only ten cents; the defendant, Woolworth Company, alone has sold it, but it has sold a very large number. Both defendants knew of the plaintiff's trade-mark during the period involved in the suit.

There is no basis for the assumption that anyone who bought one of the defendants' banks would be led to do so because he supposed that the plaintiff was its source. As we have said, the witnesses who testified that they knew the plaintiff's product by that name, were buyers of toys for retail dealers, and such buyers do not buy on the faith of a trade-mark, but are always directly acquainted with the seller with whom they deal. There is no reason to believe that anyone who bought the defendants' tawdry little gadget for use—any customer proper—has ever supposed that "Uncle Sam's" meant the plaintiff, or that it signified to him any single source whatever. Moreover, even if he had so supposed, there is not the slightest reason to think that it would have had any influence in determining him to buy; and every reason to believe that it would not. Such cheap trifles are bought on their face, so to say: for what they seem to be. Those who buy them care nothing who makes them, because they never even remotely expect to resort to the maker; nor do they rely upon his business integrity, or any proven quality of the wares.

If the plaintiff is to succeed in putting the defendants to an accounting, it must be, not because they have stolen its customers by masquerading under its name, but because it has acquired some monopoly of the words, "Uncle Sam," as such. That would, however, run counter to the whole basis of the law of the subject; for a trade-mark never really gives any property in the words themselves; all it does is so to identify the "owner" that its use by others can be said to divert to them customers who might otherwise have bought of him. Restatement of Torts; § 715, Comment b. Mishawaka Manufacturing Co. v. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381, was a very different case; the district court had found—and the circuit court of appeals had affirmed the finding—"that there was a 'reasonable likelihood' that some purchases might have been induced by the purchaser's belief that he was obtaining the petitioner's product. The ordinary purchaser, having become familiar with the plaintiff's trade-mark, would naturally be led to believe that the heels marketed by the defendant were the product of the plaintiff company.'" Upon that as a

premiss the court imposed the burden upon the defendant of showing which of its sales did not result from the confusion it had presumptively caused. Here, as we have seen, the premiss is absent; and it is clear that no buyers could have been misled. There was therefore no basis for an accounting, and certainly that portion of the judgment must be reversed.

The case is not so clear as to the injunction, because for that it is not necessary to find that the plaintiff has actually lost any sales, or even that it is likely to lose any. Moreover, although, as we have said, buyers for retailers will by no possibility actually buy the defendants' banks because they suppose themselves to be dealing with the plaintiff, they may see the banks on sale and may assume from the name, "Uncle Sam," that the plaintiff makes them; and conceivably it may hurt the plaintiff in their eyes to learn that it is putting out so paltry a product. True, there is no evidence that in fact this has, or will, hurt the plaintiff's reputation; nevertheless, it is now well settled that in such a situation the first user of the mark has an interest which courts will recognize; he need not expose his good name to the hazards of another's conduct, but may stop its use even though he cannot show that that use will result in the actual loss of trade. Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272. That interest, however, like the interest dependent upon the possible extension of the first user's business into the new field, is far less weighty than his interest in protecting his actual sales. We have twice discussed this doctrine recently, and have said that each case presents a unique problem which must be answered by weighing the conflicting interests against each other. Emerson Electric Manufacturing Co. v. Emerson

Radio & P. Corp., 105 F.2d 908, 910; Dwinell-Wright Company v. White House Milk Company, Inc., 2 Cir., 132 F.2d 822. Where the name is personal or the mark is coined, it will be hard indeed for the newcomer to find any excuse for invading it, even though his user does no more than vaguely confuse the reputation of the first user with his own; he has no lawful interest in adopting such a mark. But that is not this case; "Uncle Sam" is part of the national mythology, not entirely unlike the flag, or any other part of our inherited patriotic paraphernalia; all have a measurable interest in its use. Indeed the very fact that it has been thought necessary to forbid the use of the flag for advertising, is evidence that the use had a value, 4 U. S.C.A. § 3; § 1425 (16) N.Y.Penal Law Consol. Laws N.Y.C. The figure and name of "Uncle Sam" are not indeed the objects of the same national piety, but there is nevertheless apparently some advantage in exploiting them, and, while it remains lawful to do so, the advantage is not negligible. Balanced against any possible damage to the plaintiff's reputation among buyers for retailers, we think it should prevail. If the plaintiff had wished a truly proprietary sign, it needed only slight ingenuity to contrive one which would have protected it without question. It was not content with that; like the defendants, it wished to throw about its banks a vague implication of solidity, and at the same time to create a trade-mark. We do not say that even so it would be unable to prevent the actual appropriation of its customers; but we do hold that when there is no more at stake than a possible—and not very probable—cheapening of its reputation, it cannot deprive others of the same commercial advantage which led it originally to adopt a legend so commonly employed.

Judgment reversed; complaint dismissed.