**WYATT EARP ENTERPRISES, Inc., a corporation, Plaintiff,**

v.

**SACKMAN, Inc., also known as Sackman Brothers Company, a New York corporation, Sackman Brothers Company, also known as Sackman Brothers Company, Inc., a Pennsylvania corporation, Doe One Corporation, a corporation, Doe Two Corporation, a corporation, Doe Three Corporation, a corporation, Doe Four to Doe Ten Corporations, and John Doe Partnership, Defendants.**

**Arbitration between SACKMAN BROTHERS COMPANY and Sackman, Inc., Petitioners,**

v.

**WYATT EARP ENTERPRISES, Inc., Respondent.**

United States District Court
S. D. New York.
Jan. 10, 1958.

Abraham K. Weber, New York City, for Wyatt Earp Enterprises, Inc.

Strasser, Spiegelberg, Fried & Frank, New York City for Sackman, Inc., and others.

EDELSTEIN, District Judge.

In a suit for an injunction based upon alleged unfair competition [1] the plaintiff moves for an injunction pendente lite to restrain the defendant [2] from manufacturing and merchandising children's playsuits under the name, mark and symbol of "Wyatt Earp." After the service of the complaint and the motion for a preliminary injunction, the defendant in that suit petitioned for a stay of proceedings and to compel arbitration, under the United States Arbitration Act, 9 U.S.C. §§ 3 and 4. Both matters were brought on to be heard by orders to show cause, and were heard together.

Plaintiff is a producer of motion pictures for television and is the proprietor of a very successful series entitled "The Life and Legend of Wyatt Earp", nationally and internationally televised over the facilities of the American Broadcasting Company. The defendant has been in the business of manufacturing children's playsuits for many years, and, after the commencement of the "Wyatt Earp" television program by the plaintiff, entered into a license agreement with it purporting to grant the right to defendant to use "the name and likeness of Hugh O'Brian in the characterization of Wyatt Earp", O'Brian being the star of the program, portraying the title character. The agreement was not renewed by the plaintiff upon its expiration, another manufacturer having been licensed in place of defendant. The defendant has, after the expiration of its rights under the agreement, continued to manufacture and market children's playsuits under the name, mark and symbol of "Wyatt Earp", although without using the name and likeness of Hugh O'Brian and without specific reference to "ABC–TV".

The plaintiff seeks to enjoin the defendant's use of the name, mark and symbol "Wyatt Earp" on its playsuits on the ground that, by plaintiff's efforts, the name has come to have a secondary meaning indicative of origin, relationship and association with the television program; and that the public is likely to attribute the use of the name "Wyatt Earp" by the defendant to the plaintiff as a source of sponsorship and buy defendant's merchandise in this erroneous belief. The defendant denies the possibility of secondary meaning attaching to the name, arguing that it belonged to a living person out of the nation's history, and hence has become a part of the public domain not subject to commercial monopolization by anyone. Such a contention, I believe, overstates the law. Certainly the defendant, along with the plaintiff and everyone else, has some interest in a name out of history, as they have in words of common-speech. "The only protected private interest in words of common-speech is after they have come to connote, in addition to their colloquial meaning, provenience from some single source of the goods to which

---

1. Plaintiff also claims violations of provisions of the Lanham Trade-Mark Act, 15 U.S.C. § 1051 et seq., 15 U.S.C.A. § 1051 et seq., of the provisions of § 368–c(3) of the General Business Law of New York, McKinney's Consol.Laws, c. 20 and of the provisions of § 964 of the Penal Law of New York, McKinney's Consol.Laws, c. 40.

2. Of the several defendants mentioned in the style of the case, the one referred to in the opinion as the defendant, is Sackman Brothers Company, a Pennsylvania corporation qualified to do business in the State of New York. It is a wholly owned subsidiary of Sackman, Inc., a New York corporation whose sole activity is that of a real estate management and holding company. These two parties defendant are the only parties mentioned in the caption that have any existence. The plaintiff is a corporation organized and existing under the laws of the State of California.

they are applied." Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 138 F.2d 824, 825. The question is, in determining whether there is a protected private interest, whether the name "Wyatt Earp" has come to have such a connotation of provenience. If it has, the plaintiff has a cognizable interest in preventing the likelihood of consumer confusion, and it is such an interest as the law will protect against an opposing interest no greater than that of all persons in the use of the names in history. It is true that where a symbol is not fanciful but merely descriptive, the plaintiff bears a very heavy burden of proving confusion is likely. See dissenting opinion of Judge Frank in Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 974, 976. Or it may be that a nonfanciful, real name is such a part of the national fabric that all have a measurable interest in its use, to the extent that it acquires no secondary meaning extending into a defendant's field so as to cause a likelihood of confusion. Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 133 F.2d 853, certiorari denied 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849. "* * * [E]ach case presents a unique problem which must be answered by weighing the conflicting interests against each other." Id., 133 F.2d at page 855. Although "Wyatt Earp" is the name of an historical person, the defendant's interest in it is, I feel, not so strong as was the defendant's interest in the name "Uncle Sam" in the toy case, nor is the possibility of a secondary meaning attaching to "Wyatt Earp" so unlikely. If the plaintiff can show that it is likely to succeed, at trial, in proving that it invested the name of Wyatt Earp with a commercial significance and good will that is attributable to itself and that is likely to be appropriated by the defendant by way of consumer-confusion, it will be entitled to the relief it seeks.

It is perhaps not too much to say, even at this preliminary stage of the proceedings, that the name of Wyatt Earp has been battered into the public consciousness by the television program to an extent far beyond any fame or notoriety ever previously attached to the marshal's name. Between September of 1955 and the end of November, 1957, 102 motion picture films have been produced under the general title, "The Life and Legend of Wyatt Earp", which is also a service mark owned by the plaintiff and registered in the United States Patent Office. The films have been televised each week, 52 weeks a year, on the transcontinental release facilities of the American Broadcasting Company. More than $3,000,000 has been spent by the plaintiff in producing the films, and more than $3,500,000 has been received by the television network for its time and facility charges during the two year period commencing in September of 1955 and ending in August of 1957. Such charges continue to be made and received at the rate of more than $2,000,000 per year. By reason of the popularity of the production, enormous publicity has been generated in other media of mass communication. Popularly known as the "Wyatt Earp Program", it has from its inception been among the most popular television entertainments in the nation, viewed weekly on millions of television receivers by additional millions of persons. As an indication of the public acceptance of the program, there has been a great and increasing nation-wide demand for articles and products sponsored by the plaintiff and bearing the name, mark and symbol of "Wyatt Earp". It has been asserted without denial or other comment that goods and merchandise marketed under the name of "Wyatt Earp" were unheard of prior to the first telecast of the show. The finding is nearly inescapable that the commercial value now enjoyed by the name is attributable almost entirely to the program. The plaintiff, as a result, has entered into the business of licensing merchandise rights in connection with the program under agreements controlling the nature and quality of the goods licensed so as to maintain high standards and to preserve the integrity of its good will. Under these agreements the royalties to be received for the year 1957

will exceed $100,000. The merchandise so promoted, in no way unique aside from its program identification, obviously sells much more readily than the same merchandise would sell without the program identification, as borne out by the fact that manufacturers pay and seek to pay substantial sums of money for the privilege of sponsorship, by way of licensing agreements. It can be found preliminarily, therefore, that the name and characterization of "Wyatt Earp" as televised by the plaintiff has become identified in the mind of the consumer public with merchandise upon which the name has been imprinted; that this identification and good will has extended to the field of children's playsuits sold and distributed under the name, mark and symbol "Wyatt Earp"; and that defendant is merchandising "Wyatt Earp" playsuits because of a popular demand for merchandise identified with the program and the plaintiff.

■ Since the expiration of its privileges under the licensing agreement with the plaintiff, the defendant has marketed its play clothes without the name and likeness of the star of the television program and without specific reference to "ABC–TV". It further has made certain modifications in the design of its suits. Samples of suits made by the defendant under its license and made after the expiration of its license, as well as a sample made by the current licensee, together with their boxes were handed up to the court as exhibits. Defendant's present outfit, despite the changes, appears to bear a striking resemblance to the outfit it previously made under license and to the one made by the present licensee; and these costumes, approximating the one worn by the television "Wyatt Earp", indeed seem to be markedly different from other "western" costumes. The defendant continues to mark on its boxes the name "Wyatt Earp" together with the legend "official outfit". Moreover, in its catalogue, the Wyatt Earp outfit is advertised in a context with three "TV personality" western outfits, all of them be-

ing characterized as "official", but with the "TV personality" designation omitted from the Wyatt Earp display. The text and layout are presented in such a manner as to convey the impression of an identification of defendant's Wyatt Earp playsuit with the Wyatt Earp television program. Indeed, it is so difficult to understand how any other impression could be conveyed that the finding of an intent to convey an erroneous notion of association with the program is highly probable. Unless the word "official" is passed over as sheer gibberish, the idea of sponsorship is inescapably implied.

■ The "critical question" in a case of secondary meaning "always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source." Charles D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 194 F.2d 416, 419. For under the common law of unfair competition, as well as under the Lanham Act, the likelihood of consumer-confusion is the test of secondary meaning. Id., at page 421. I find that, for the purposes of preliminary injunctive relief, plaintiff has met the burden of proving the likelihood of consumer-confusion. The public is moved to buy merchandise because of an identification with the name "Wyatt Earp" as developed by the plaintiff's television program. The defendant's use of the name created a likelihood that the public would believe, erroneously, that its playsuits were licensed or sponsored by the plaintiff, to the injury of the plaintiff's good will and to the hazard of its reputation. There is a high probability that, upon the trial of the issues, plaintiff will be able to establish that the name, mark and symbol "Wyatt Earp" has acquired a secondary meaning in the minds of the public as identified and associated with the television program and the plaintiff, and extending into the field of children's playsuits.

■ It is true that the plaintiff and defendant are not direct competitors in the same field of endeavor. The plaintiff

does not manufacture children's playsuits. But where secondary meaning and consumer-confusion are established, use of a trade name even upon non-competing goods may be enjoined. See Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 972, 973. And as held by the Court of Appeals in that case, the same principle applies to the situation of confusion about sponsorship. "In either case, the wrong of the defendant consisted in imposing upon the plaintiff a risk that the defendant's goods would be associated by the public with the plaintiff, and it can make no difference whether that association is based upon attributing defendant's goods to plaintiff or to a sponsorship by the latter when it has been determined that plaintiff had a right to protection of its trade name." Id., at page 973. See also, Hanson v. Triangle Publications, 8 Cir., 163 F.2d 74, certiorari denied 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424; Adolph Kastor & Bros. v. Federal Trade Commission, supra; Esquire, Inc. v. Esquire Bar, D.C., 37 F. Supp. 875. Furthermore, in the case at bar, it would seem that something more than mere sponsorship is involved, something that very closely approaches direct competition. The plaintiff does not manufacture children's playsuits, but it licenses another to do so on a royalty basis. Any customers purchasing from the defendant on the strength of the "Wyatt Earp" name are customers diverted from plaintiff's licensee, to its direct pecuniary injury, in addition to any danger to its reputation.

While there is little doubt that the violation of plaintiff's rights by a diversion of purchasers to the defendant could readily be compensated for in a judgment for money damages, it also appears that a denial of preliminary injunctive relief would work irreparable and serious injury to the plaintiff by jeopardizing the entire licensing system it has built at great effort and expense. On a balance of the harms, the plaintiff stands to suffer much greater injury by a denial of injunctive relief than any which can befall defendant by granting such relief.

Accordingly, the motion for a preliminary injunction will be granted.

In its motion for a stay and to compel arbitration, the petitioner-defendant takes the position that what is involved in the respondent-plaintiff's action is the rights of the latter under the agreement between the parties and alleged violations of those rights by the former. Breach of the agreement is denied and the contention is made that the contract created no rights in the licensor (respondent-plaintiff) that entitled it to the protection of this court. It is demanded that the suit for an injunction be stayed and arbitration be compelled of the question of the violation of the licensing agreement and any rights created thereby.

Section 3 of Title 9 U.S.C. authorizes the court to grant a stay "upon being satisfied that the issue involved * * * is referable to arbitration." The written agreement between the parties provides for the arbitration of any dispute or disagreement between the parties "arising out of or relating to" the licensing contract. But the controversy between the parties, certainly the claim of the plaintiff, is one involving the issue of unfair competition. The action sounds not in contract but in tort, and the issue is not defined by the question of the rights of the parties under the agreement. If the dispute were confined to issues of whether or not the contract was violated, it would be referable to arbitration. But *"the issue involved"*, see International Union, United Automobile Aircraft v. Benton Harbor Malleable Industries, 6 Cir., 242 F.2d 536, 539, 542, is much broader in scope, requiring a consideration of facts and factors beyond the contract. Even if any existing subordinate contract issues were resolved by arbitration, *"the issue involved"* would remain. Indeed, in the absence of a license agreement and of defendant's operation under it, the broad issue would remain. No arbitration decision interpreting the contract could determine the controversy at bar. To delay the suit for injunctive relief and

require arbitration would merely add to the "costliness and delays of litigation" it was the purpose of the Arbitration Act to eliminate. 68 Cong., 1st Sess., House of Rep. Report No. 96. For the controversy between the parties would still have to be decided by this court. Whether or not defendant has competed unfairly with the plaintiff presents an issue far transcending one merely "arising out of or relating to" the contract between the parties, and it is inconceivable that they intended such a dispute to be settled by arbitration. While the parties have made an agreement to arbitrate, the filing of suit for injunctive relief does not constitute a failure, neglect or refusal of the respondent-plaintiff to perform its agreement under 9 U.S.C. § 4. The motion for a stay and to compel arbitration will be denied.