**WARNER BROS., INC., Plaintiff,**

v.

**GAY TOYS, INC., Defendant.**

**No. 81 Civ. 1880 (WK).**

United States District Court,
S. D. New York.

May 19, 1981.

Cowan, Liebowitz & Latman, P. C., by Carol Simkin, New York City, Weiss, Dawid, Fross, Zelnick & Lehrman by Heinz Dawid, New York City, for plaintiff.

Milton M. Wolson, New York City, Robert G. Mentag, Detroit, Mich., for defendant.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

In this suit based on alleged violations of the Lanham Act and related state claims of unfair competition, plaintiff moves for a preliminary injunction restraining the defendant from marketing toy automobiles that resemble those which form the focal point for plaintiff's television series. Having carefully considered the submissions made by the parties and the arguments of counsel, we deny plaintiff's motion. This memorandum shall constitute our findings of fact and conclusions of law.

### Facts

Plaintiff, a Delaware corporation having its principal place of business in California, is a well-known producer of movies and television shows. Defendant, a Michigan corporation having its principal place of business in that state, is a leading manufacturer of toys.

Among the television shows produced by plaintiff is a highly successful series known as "The Dukes of Hazzard" which, since January of 1979, has been regularly broadcast on the CBS television network. A prominent feature of this series—referred to by plaintiff as the series' "signature"—is the "General Lee", a striking orange automobile identified by the words "GENERAL LEE" and a modified confederate flag on its roof, and the number "01" prominently affixed to each side door. This car appears to be a central figure in each episode of the series and the human actors, the "Duke Boys", employ it in a never-ending succession of adventures in which its spectacular performance enables them repeatedly to escape from the clutches of the evil sheriff of fictitious Hazzard County. Because of the car's use in the program and the vast amounts of money plaintiff has spent in advertisements of the series with the "General Lee" prominently featured, it has come about that a substantial segment of the public—especially children—instantly think of the series when they see the car or a replica of it.

As is customary in the television industry, the plaintiff plans to profit from the "General Lee's" popularity by granting a number of manufacturers licenses to copy it. We are informed by counsel for the plaintiff that—again, as is customary in the industry—the revenues plaintiff expects to derive from such licenses in 1981 exceed by far the broadcast revenues expected from the series for that year.

Defendant has, for some time, sold toy automobiles made in the image of a Dodge Charger, and produced in a number of colors. After plaintiff's "General Lee" demonstrated its appeal, defendant decided to capitalize on its popularity. Having requested and been denied a non-exclusive license from the plaintiff, defendant put out the toy here in issue, an orange Dodge Charger with a confederate flag on its top and the number "10" on each side door. This toy is for all practical purposes identical in appearance to the "General Lee" except that the words "GENERAL LEE" are not written on its roof, and the numbers on its side doors are the reverse of those found on the real "General Lee" ("10" instead of "01"). At the time the defendant placed its toy on the market, neither plaintiff nor any of its licensees had—so far as the evidence before us indicates—come out on the market with any significant number of toys or other objects associated with the "Duke of Hazzard" program.

After this action had been brought, plaintiff caused a survey to be taken which establishes, to our satisfaction, that a substantial number of children, when holding defendant's car in their hand, immediately think of plaintiff's "General Lee" and "The

Dukes of Hazzard" television series.[1] From this we would infer that many children buy the car (or induce their parents to buy it for them) as a prop for play in which they pretend they are the "Duke Boys" of television fame. However, there is nothing in the survey to suggest that purchasers are in any way concerned with who may manufacture the car, nor is there anything to suggest that purchasers think that plaintiff controls the quality of defendant's toy or in any other way "sponsors" it.

In this lawsuit, plaintiff seeks to have defendant enjoined from marketing its toy copy of the "General Lee".[2] In so doing, plaintiff does not allege any copyright, design patent, or registered trademark which protects its design per se. It relies exclusively on the facts—which we find to be facts—that plaintiffs created the design and made it popular by virtue of its broadcasting and advertising activities, that defendant's product is readily identified as resembling plaintiff's creation, and that defendant intentionally designed its product to capitalize on the popularity of plaintiff's "General Lee". Plaintiff now moves for a preliminary injunction barring defendant

from marketing its product without first removing the modified confederate flag from its roof and the "10" from its side doors. For the reasons set forth below, that motion is denied.

*Discussion*

In this Circuit, a plaintiff seeking preliminary injunctive relief must make a showing of irreparable harm and, in addition, demonstrate either a likelihood of success on the merits or the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation. In the latter situation (fair ground for litigation), it must also establish that the balance of hardships tips decidedly in its favor. *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.* (2d Cir. 1979) 604 F.2d 755, 758–59. Assuming *arguendo* that plaintiff has established irreparable harm, we turn to an examination of plaintiff's substantive position.

The basic inquiry in an unfair competition action in this forum is whether the public is likely to be misled into believing that the defendant is distributing products

---

1. This survey was taken at the Sunrise Mall in Massapequa, Long Island on Saturday, March 28 and Sunday, March 29, 1981. 102 children between the ages of 6 and 12 and twelve were shown one of the toy automobiles in question and were asked if they had ever seen a car that resembled it. If they answered yes, they were asked where; and if they answered on television, they were asked to name the program and to indicate what there was about defendant's toy car that led them to give this answer. If they did not initially recognize the car they were asked if they watched plaintiff's television show "The Dukes of Hazzard" and the interview was terminated.

   82 of the 102 children interviewed indicated that they recognized the toy car as either from "The Dukes of Hazzard", "The Dukes", or as the "General Lee." When asked what there was about defendant's product that led them to give this response, the children generally identified the "flag/confederate flag/X/sticker" on the top of the car, the "number/sticker" on the side of the car, and the car's color.

   At no point were the children asked whether they thought defendant's product was manufactured by or in cooperation with the producers of plaintiff's television series, and they were not asked if they would buy the car because

they thought it was in any way officially connected with that series.

2. Both the lawsuit and the instant motion for a preliminary injunction encompass, as well, a claim based on another vehicle in plaintiff's television show—the car driven by the evil sheriff of Hazzard County. Plaintiff's car is an essentially standard sheriff's car, white, and recognizable solely by virtue of an allegedly distinctive "Hazzard County" emblem on each side door. Defendant has produced and is merchandising a standard white sheriff's car with an emblem on each side door entitled "Hazard, Kentucky", which defendant claims is the name of a real place.

   At argument of the motion for a preliminary injunction, plaintiff conceded that its case in chief focussed on the "General Lee" and that the sheriff's car was merely a tag-along. For purposes of convenience, we therefore discuss the case in terms of the facts relevant to the "General Lee." In the event that this matter proceeds further, however, we note that plaintiff has presented us with no evidence that the purchasing public associates defendant's "Hazard, Kentucky" car more closely with plaintiff's "Hazzard County." car than with the general idea of a white sheriff's car.

manufactured or vouched for by the plaintiff.[3] Thus, in *American-Marietta Co. v. Krigsman* (2d Cir. 1960) 275 F.2d 287, Judge Hand observed (at 289):

"The whole basis of the law of 'unfair competition' . . . is that no one shall sell his goods in such a way as to make it appear that they come from some other source."

*Accord: Vitarroz Corp. v. Borden, Inc.* (2d Cir. 1981) 644 F.2d 960; *Perfect Fit Industries, Inc. v. Acme Quilting Co.* (2d Cir. 1980) 618 F.2d 950, 953; *American Footwear Corp. v. General Footwear Co.* (2d Cir. 1979) 609 F.2d 655, 663, *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *McGregor-Doniger, Inc. v. Drizzle Inc.* (2d Cir. 1979) 599 F.2d 1126, 1130; *Mushroom Makers, Inc. v. R. G. Barry Corp.* (2d Cir. 1978) 580 F.2d 44, 47, *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Societe Comptoir de l'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.* (2d Cir. 1962) 299 F.2d 33, 36; *Joshua Meier Co. v. Albany Novelty Mfg. Co.* (2d Cir. 1956) 236 F.2d 144, 147; *Triangle Publications v. Rohrlich* (2d Cir. 1948) 167 F.2d 969, 972; *Yale Electric Corp. v. Robertson* (2d Cir. 1928) 26 F.2d 972, 973; *Crescent Tool Co. v. Kilborn & Bishop Co.* (2d Cir. 1917) 247 F. 299, 300. See also *Shaw v. Time-Life Records* (1975) 38 N.Y.2d 201, 379 N.Y.S.2d 390, 305.

In the case at bar, however, it seems unlikely that any purchaser of defendant's products will be misled into believing they are manufactured or vouched for by the plaintiff. Plaintiff has, as yet, established no reputation in this field. Neither it nor its licensees have put out any significant number of "Dukes of Hazzard" products bearing the "mark" of the "General Lee", cf. *Universal City Studios, Inc. v. Montgomery Ward & Co.* (N.D.Ill.1980) 207 U.S.P.Q. 852, 855; *DC Comics, Inc. v. Powers* (S.D.N.Y.1978) 465 F.Supp. 843, 847; *Wyatt Earp Enterprises, Inc. v. Sackman, Inc.* (S.D.N.Y. 1958) 157 F.Supp. 621, 624–25; *Warner Bros. Inc. v. Road Runner Car Wash, Inc.* (TTAB 1976) 189 U.S.P.Q. 430, 430–31, nor has defendant advertised its product so as to suggest it is an "official" replica of the "General Lee." Cf. *American Broadcasting Co. Merchandising, Inc. v. Button World Mfg., Inc.* (N.Y.Sup.Ct., N.Y.Co.1966) 151 U.S.P.Q. 361; *Wyatt Earp, supra,* 157 Supp. at 625. While we readily infer that purchasers of defendant's toy use it as a prop to act out recreations of the "Dukes of Hazzard" show, there is nothing in this, nor in any other evidence adduced by plaintiff, to suggest that such purchasers are at all concerned with who manufactures the toy or with whether its manufacturer is sponsored by the producer of the television series.

Nor can plaintiff find support in those cases, stemming from the Supreme Court opinion in *International News Service v. Associated Press* (1918) 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, which seek to prevent one from misappropriating the skill, expenditures, and labors of another. In all such cases that have come to our attention, the prevailing plaintiff has been able to point to the abuse of a confidential or fiduciary relationship or to some element of fraud or deception. See, e. g., *Flexitized, Inc. v. National Flexitized Corp.* (2d Cir. 1964) 335 F.2d 774, 782, *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); *Electrolux Corp. v. Val-Worth, Inc.* (1959) 6 N.Y.2d 556, 190 N.Y.S.2d 977, 986; *Reiner v. North American Newspaper Alliance* (1932) 259 N.Y. 250, 181 N.E. 561; *Madison Square Garden Corp. v. Universal Pictures Co.* (1st Dep't 1938) 255 App.Div. 459, 7 N.Y.S.2d 845, 849–50, *appeal denied,* 256 App.Div. 807, 9 N.Y.S.2d 895; *Dior v. Milton* (Sup.Ct.N.Y.Co.1956) 9 Misc.2d 425, 155 N.Y.S.2d 443, 454, *aff'd mem.* (1st Dep't) 2 A.D.2d 868, 156 N.Y.S.2d 996; *Metropolitan Opera Ass'n. v. Wagner-Nichols Recorder Corp.* (Sup.Ct.N.Y.Co.1950) 19 Misc. 786, 101 N.Y.S.2d 483, 489, *aff'd,* 279

---

**3.** At a later stage of our opinion we advert to the New York case law on misappropriation of another's skill, expenditures and labors. There is otherwise no need to distinguish, for purposes of this particular action, between rights arising under the Lanham Act as construed in this Circuit and rights arising under the New York common law of unfair competition.

App.Div. 632, 107 N.Y.S.2d 795 (1951). There is here no possibility of fraud; we find no deception; and no confidential fiduciary relationship has been demonstrated.

We therefore conclude that plaintiff is unlikely to prevail on the merits under either the New York common law or the Lanham Act as that Act has heretofore been construed in this Circuit.

There is, however, a relatively recent Fifth Circuit decision which tends to support the plaintiff's position. *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.* (5th Cir. 1975) 510 F.2d 1004, *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1976). There the Fifth Circuit, observing that it was dealing with a case of "first impression" (*Id.* at 1008), and coming to a decision that it felt might "tilt the trademark laws" (*Id.* at 1011), held that the owner of a professional hockey team could prohibit any unlicensed person from manufacturing or selling shoulder patches bearing the team's emblem, whether or not such emblem had been registered as the team's trademark.

We do not believe our Circuit would agree that such an extension of heretofore accepted concepts should—at least on the facts at bar—be accomplished by judicial, rather than legislative fiat.[4] There is no evidence before us to indicate whether plaintiff's television program causes the sale of a single extra automobile by the toy industry as a whole, or whether it simply diverts purchasers from one design to another. Furthermore, assuming that the program in fact creates a new or additional market for toys, it seems to us that it should be a legislative decision whether a television producer should have arbitrary control over which of competing manufacturers can benefit from the incidental fallout from its broadcasting activities, or whether its legitimate economic interests may be adequately protected by some sort of compulsory licensing system which would permit any manufacturer so to benefit upon payment of a reasonable royalty.

Although, as indicated, we do not believe that the plaintiff—on the basis of any facts now before us—is likely to prevail on the merits, we must recognize that it has presented a question providing a fair ground for litigation. However, we are satisfied that the defendant clearly prevails on the balance of hardships test. An injunction would prohibit defendant from making sales readily available to it at this time, whereas it is difficult to see what if any economic loss plaintiff would suffer from such sales. Indeed, it is obvious that the plaintiff's primary purpose in bringing this action is not to stop the sale of a few toy automobiles, but to validate its entire licensing program. A *temporary* injunction would not assist it in this endeavor.

Plaintiff's motion for a preliminary injunction is accordingly denied and the stay heretofore granted (and extended by stipulation) is vacated. The parties are directed to communicate with Chambers within two weeks from the date of this order to establish an expedited schedule looking toward a final judgment on the merits of the complaint.

SO ORDERED.

---

4. In *International Order of Job's Daughters v. Lindeburg and Co.* (9th Cir. 1980) 633 F.2d 912, the Ninth Circuit rejected the contention that a trademark's owner has a complete monopoly over the trademark's use in commercial merchandising. *Id.* at 918. The Court suggested, moreover, that the Fifth Circuit has since retreated from any such expansive interpretation of *Boston Professional Hockey.* Thus, the Court observed (at 918, n.10):

"The Fifth Circuit itself has apparently retreated from a broad interpretation of *Boston Hockey.* In *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977), the court began its analysis of Kentucky Fried Chicken's infringement claim by noting that it 'reject[ed] any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the protection of our markets,' and described the *Boston Hockey* holding as premised on a finding that consumers were likely to believe that the emblems somehow originated from the hockey clubs. 549 F.2d at 389."