**ARTHUR GUINNESS & SONS, PLC,**
**Plaintiff-Appellant,**

v.

**STERLING PUBLISHING COMPANY,**
**INC., Defendant-Appellee,**

**and**

**Bantam Books, Inc.,**
**Intervenor-Defendant.**

**No. 1009, Docket 83–9056.**

United States Court of Appeals,
Second Circuit.

Argued March 28, 1984.

Decided April 16, 1984.

Oliver P. Howes, Jr., Nims, Howes, Collison & Isner, New York City (Julie A. Lau-

ber, Thomas J. Ward, J. Dickson Burton, Ward Lazarus, Grow & Cihlar, Washington, D.C., of counsel), for plaintiff-appellant.

Jeffrey A. Mishkin, Proskauer, Rose, Goetz & Mendelsohn, New York City (Francis D. Landrey and David M. Lederkramer, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, KEARSE and PIERCE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

For the past thirty years, the human adventure in its astonishing, recondite, inspiring, and not infrequently bizarre variety has been chronicled in a unique publication. First styled the "Guinness Book of Superlatives" and later the "Guinness Book of Records", this product of a British brewery's desire to settle its customers' barroom disputes is widely known in America and elsewhere as the "Guinness Book of World Records." The record book, published in the United States since 1961 by Sterling Publishing Co. ("Sterling") under license from Arthur Guinness & Sons PLC ("Guinness"), has long since outgrown its original conception as an arbiter of drinking companions' arguments. The Guinness Book of World Records has become an institution—a fascinating chronicle of human achievement and natural wonders.

The compilers of the record book are not unacquainted with the judicial system. Their tome describes history's most protracted litigation (761 years for a dispute involving religious festivals, finally terminated in India in 1966), the highest bail ($50 million, in 1977 in Iran), and the shortest probated will (two words in length). In October, 1983, Guinness became a participant, rather than a spectator, of the legal process when it commenced this action against Sterling, its American licensee, alleging trademark infringement and false designation of origin of goods in violation of the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1114, 1125(a). Guinness's complaint, and its application for a temporary restraining order, were the culmination of a dispute between the British licensor and the American licensee that began two years earlier.

The trial court denied the request for a temporary restraining order, and subsequently held a hearing on Guinness's motion for a preliminary injunction requesting an order that Sterling refrain from selling, distributing, or advertising the 1984 American edition of the Guinness Book of World Records. Judge Duffy denied that motion in November, and Guinness brought this appeal. We conclude that the district court's denial of Guinness's motion is consistent with the preliminary injunction standards this Circuit has formulated. Accordingly, we affirm the trial court's order. Before discussing our reasoning in greater detail, we set forth the relevant facts.

## I.

The Guinness-Sterling relationship began in 1961, when Sterling secured the exclusive right to use the Guinness trademark in the United States to publish the American edition of the Guinness Book of World Records. Sterling has produced the American edition annually since that time. A new License Agreement dated January 31, 1973 extended Sterling's exclusive right to publish the Guinness Book of World Records in the United States until the year 2016, subject to editorial review and approval of each edition by Guinness. A Publishing Agreement concluded February 2, 1973, set forth the operational details of the arrangement. According to the Agreement, Guinness was to begin furnishing Sterling with page proofs of the subsequent year's British edition each May, and all page proofs (or "updating materials") were to be provided by August 15. Sterling would then revise and modify the updating materials for the United States market (substituting baseball records for cricket statistics, for example) and ship its American edition to bookstores in time for the Christmas season.

The Publishing Agreement also gave Sterling the exclusive right to negotiate

merchandising "tie-ins" involving the Guinness name, subject to final approval by the licensor. Guinness was to receive 50% of the net proceeds from such licenses, after Sterling had deducted "all direct out of pocket expenses (including reasonable agency commissions and legal fees if any)." Examples of merchandising rights specified in the contract include tie-in licenses for puzzles, chewing gum and coloring books. The Agreement could be terminated by Guinness if Sterling "wilfully [broke] an important obligation" of the contract and failed to cure it within one month of notification. Both parties adhered to the Agreement without apparent rancor for seven years.

Guinness acquired new management in 1981, and by the company's own account, began to re-evaluate its relationship with Sterling. In April, 1982, Guinness formulated new guidelines for the merchandise licenses, instituting detailed procedures for Sterling to follow in obtaining Guinness's approval. Sterling, for example, had entered into negotiations for an American manufacturer to produce Guinness wallpaper; Guinness insisted that a formal request be made for that license despite Sterling's belief, based on Guinness's previous furnishing of British wallpaper samples, that the license would be authorized by Guinness. As part of its new procedures, Guinness insisted that Sterling itemize the legal fees it deducted from royalty payments. Previously, Sterling had deducted from the royalties related to merchandising a percentage of the monthly retainer it paid to its law firm.

Guinness continued to suspect that the legal fee withholdings were excessive, and that Sterling was charging Guinness for expenses unrelated to licenses approved by Guinness. In September, Sterling's lawyer submitted an itemized bill for work performed beginning in April 1982. Guinness immediately disputed Sterling's right to deduct these fees from the royalty payments Sterling was forwarding to Guinness. The details of the dispute do not properly concern us for purposes of this appeal, because they presumably will be the subject of further litigation in the underlying suit from which the motion for an injunction arose. In brief, Guinness contends that the fees deducted by Sterling are not attributable to work connected with Guinness. Sterling asserts that the disputed expenses were incurred in connection with negotiations for licenses which Guinness refused to approve. The dispute continued for the next six months, with Guinness adding the further demand that the Publishing Agreement be re-negotiated and the merchandising rights returned to Guinness's exclusive control.

On April 14, 1983, Guinness informed Sterling that it regarded the licensee's refusal to pay the disputed amounts as a wilful breach of an important obligation, thereby invoking the threat of termination. Guinness demanded immediate payment. Sterling responded by tendering $16,388 in disputed deductions, but the American publisher continued to insist that $33,600 in legal fees was properly withheld. Guinness, referring not only to the fee dispute but to its dissatisfaction with the quality of Sterling's merchandising efforts, responded by informing Sterling that it considered the license and Publishing Agreement terminated.[1]

---

1. The specific sums at issue when Guinness purported to terminate the license were $33,600 in legal fee deductions made by Sterling on grounds that the legal work was connected with negotiations for merchandising tie-ins; $4568 in legal fees for contract interpretation which Sterling claimed Guinness requested it to obtain; and $11,820 in "claims" for income lost by Sterling because of Guinness's actions. Sterling paid Guinness a total of approximately $300,000 in royalties in 1982, although the record does not disclose how much of this was attributable to merchandising licenses.

Following Guinness's threatened termination, Sterling remunerated its licensor for all but the $33,600 in disputed legal fees. At the inception of the hearing on the preliminary injunction, Sterling conceded that under a strict construction of the Publishing Agreement, $20,100 of the $33,600 should not have been withheld, because the merchandising licenses to which the legal work related were never formally approved by Guinness.

For the duration of 1983, Sterling made timely demands upon Guinness to furnish the 1984 page proofs in accordance with the procedure that had been followed each year since the inception of the license. Guinness steadfastly refused, although it had been informed as early as May 5 that Sterling, which had ordered paper, reserved presses, placed advertisements in trade publications and already received orders for the next edition, fully intended to produce the 1984 record book. Faced with Guinness's refusal to supply the page proofs, Sterling proceeded to produce the 1984 edition by revising and modifying the 1983 version. Sterling followed the same procedure used in preparing previous editions. It prepared new editorial material for the American market, updated those sections for which it had information on new world records, and edited the book to appeal to American readers. In accordance with the terms of the license, it offered page proofs for Guinness to approve, but the licensor refused to cooperate in any way. 90,000 non-returnable hardcover copies of Sterling's 1984 American edition had been shipped to customers throughout the United States by October 21, 1983, the date on which Guinness served the order to show cause seeking a temporary restraining order.

Judge Duffy denied the request for a restraining order, and following a two-day hearing that concluded Nov. 1, denied the motion for a preliminary injunction, finding that Guinness failed to show that Sterling's publication would cause irreparable injury, or that Guinness was substantially likely to prevail on the merits of the fee dispute. This appeal followed.

## II.

■ We now turn to the applicable law. The purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute. *See 7 Moore's Federal Practice* ¶ 65.04[1] (1982). It is well-settled in this Circuit that the party seeking injunctive relief must establish that the injunction is necessary to prevent irreparable harm and that he is likely to prevail on the merits of the underlying controversy. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). In the alternative, the moving party need not show likelihood of success on the merits, but must demonstrate the presence of sufficiently serious and substantial questions going to the merits as to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the movant. *Id.; see also Buffalo Courier-Express v. Buffalo Evening News*, 601 F.2d 48, 54 (2d Cir.1979). On this appeal, Guinness bears the heavy burden of establishing that the trial court misapplied these accepted principles. Our review on appeal is limited to determining whether the trial judge abused his discretion in denying the motion. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

■ Without a showing of irreparable injury, Guinness would have no right to an injunction under either of the two tests. It is widely recognized that a pirate's use of another's trademark can, without more, establish so substantial a likelihood of confusion among consumers as to warrant a preliminary injunction. *See, e.g., Warner Brothers Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir.1981), *rev'g* 513 F.Supp. 1066 (S.D.N.Y.1981), *after remand*, 724 F.2d 327 (2d Cir.1983), *aff'g* 553 F.Supp. 1018 (S.D.N.Y.1983). But the instant case is not one where an unauthorized junior user appropriates a senior user's mark. Because Sterling is Guinness's licensee and the American edition of the Book of World Records has been produced by Sterling since 1961, we cannot perceive how Sterling's 1984 publication could irreparably have harmed its licensor unless the product was so inferior that it could severely injure Guinness's reputation in the United States. *See Bell & Howell: Mamiya Co. v. Masel Supply Co., supra*, 719 F.2d at 46; *cf. Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563 (2d Cir.1982) (use of trademark by unlicensed, unauthorized party).

■ The sole evidence adduced at the hearing to establish irreparable injury was Guinness's assertion that Sterling's 1984 edition did not contain up-to-date records, a necessary concomitant of the British licensor's refusal to cooperate with Sterling by providing the updating materials required by the Publishing Agreement. Judge Duffy concluded, however, that this characteristic of the record book could not have irreparably harmed Guinness. The licensor's own witness testified that new world records are claimed daily. The trial court's conclusion that the record book is, in a sense, continually out of date, based on its evaluation of testimony, was not clearly erroneous, and therefore we decline to reverse it. *See State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 752 (2d Cir.1977).

■ Guinness also contends that it was prejudiced when the trial judge announced after the first day that he was converting the consolidated hearing on the motion for a preliminary injunction and the trial on the merits, Fed.R.Civ.P. 65(a)(2), into a hearing solely on the injunction issue. The licensor claims that because the trial judge stressed the importance of showing that the Publishing Agreement was terminated, it did not present extensive evidence of irreparable injury, but instead concentrated on the full trial issue of whether it had a right to

terminate the contract. We can perceive no prejudice to Guinness as a result of the trial court's action, because a full day of hearings ensued in which Guinness had a full opportunity to meet its burden as the party seeking an injunction. Moreover, the judge's emphasis upon whether the Publishing Agreement had been terminated could not have been misleading to Guinness, since the licensor would have to show that the Publishing Agreement was no longer in force to obtain an injunction. *See* Part III *infra.* Moreover, Guinness raised no objection to the court's action at the hearing and never suggested below that it had additional evidence on the issue of irreparable injury that it had been foreclosed from presenting. Because Guinness has made no showing on appeal that the finding there was no irreparable injury is clearly erroneous, we will not reverse the trial court's conclusion.[2]

■ Although the failure of Guinness to establish irreparable injury is sufficient grounds for denying the injunction under either the likelihood of success or substantial question standard, the trial court ruled in the alternative that Guinness failed to demonstrate that the balance of hardships tipped in its favor. The uncontradicted testimony of Guinness's own witness was that Guinness had a hand in precipitating the very harm it now asserts is irreparable:

**2.** Guinness's other claims of irreparable injury are similarly unsupported by the record. Sterling's 1984 edition contains a foreword written by Lord Iveagh, Chairman of Guinness, essentially copied from the 1983 edition; moreover, it lists Norris McWhirter as "Editor and Compiler." Guinness contends that neither of these individuals consented to use of their names in connection with the book. McWhirter, however, has been listed as "editor and compiler" on every edition ever produced by Sterling, and Sterling followed the normal procedure authorized by the Publishing Agreement in using the previous edition's foreword. The page proofs of these portions of the 1984 edition were submitted by Sterling to Guinness prior to publication, but Guinness made no comment other than its refusal to supply page proofs or otherwise assent to Sterling's publication.

Guinness also asserts that Sterling authorized activities that reflected adversely upon the record book's image. Specifically, Guinness

was displeased with the quality of a "Guinness Book of World Records Tour" of Japan authorized by Sterling, and consented to by Guinness. Guinness also objected to a "Guinness Day" event in which Japanese tourists were brought to Los Angeles. These disagreements reflect the long-simmering dispute between the British licensor and the American licensee as to the proper approach to take in merchandising the Guinness name in America. We express no view on the merits of Guinness's assertion that Sterling has wilfully broken an important obligation of the Publishing Agreement in arranging for these events and the other merchandising tie-ins. Because the Agreement gives Sterling the right to merchandise the Guinness name, however, we cannot say that the dispute over the quality of the licenses is so abundantly unquestionable to be adjudged a breach justifying termination and to compel the granting of a preliminary injunction.

that Sterling's volume is not up-to-date. Guinness refused to supply updating materials or edit Sterling's page proofs during the five-month period in 1983 specified by the Publishing Agreement as the time for such work to be performed. The contribution by Guinness to the alleged defects in the 1984 edition, its failure to bring suit for six months while Sterling proceeded with its announced plan to publish the book, and, as Judge Duffy found, the licensor's apparent attempt to exploit the fee dispute to renegotiate the terms of the license, all support the conclusion Guinness failed to establish that the balance of hardships tips decisively in its favor.

### III.

█ Failure to establish irreparable injury would ordinarily be the end of our inquiry, *see Bell & Howell: Mamiya Co. v. Masel Supply Co., supra,* 719 F.2d at 42. We note, however, that on this record Guinness would fail to meet its burden as the party seeking injunctive relief even if publication of the 1984 American edition were to constitute irreparable harm. As we noted in Part II *supra,* Guinness would be required to establish that it was substantially likely to prevail on the merits of the underlying license dispute; alternatively, if the balance of hardships weighed in its favor, it could show that the contract dispute was a serious and substantial question going to the merits of the litigation. Whether Sterling's refusal to compensate its licensor for the disputed fees was a "wilful" breach of "an important obligation" of the Publishing Agreement is, of course, a serious and substantial question. Failure to pass the balance of hardships test, however, forecloses Guinness from obtaining an injunction on the basis of the seriousness of the underlying issue. Guinness would therefore be required to show that it is substantially likely to prevail on the merits of the fee dispute, assuming arguendo it could establish irreparable injury.

We do not decide the merits of Guinness's claim that Sterling's actions empower it to terminate the license. We note,

however, that there is sufficient doubt whether Guinness would prevail on the merits, precluding injunctive relief. Whether Sterling wilfully broke an important obligation in withholding the disputed legal fees, as Guinness contends, or whether, as Judge Duffy concluded, the quarrel was an honest disagreement concerning a relatively small sum, is a matter sufficiently unclear at this stage to warrant denial of Guinness's motion. Because Sterling was licensed to produce the record book, Guinness was required to demonstrate the likelihood that the publishing agreement was no longer in force. *Oleg Cassini, Inc. v. Couture Coordinates, Inc.,* 297 F.Supp. 821, 827 (S.D.N.Y.1969).

We have previously indicated that a bona fide dispute concerning royalty payments does not, as a matter of law, establish a material breach justifying rescission of the contract absent an express provision in the agreement. *Nolan v. Sam Fox Publishing Co.,* 499 F.2d 1394, 1397 (2d Cir.1974). The Guinness-Sterling publishing agreement at no point states that any violation of its terms must necessarily be considered a breach of an "important obligation." Whether Sterling's action in withholding disputed legal fees is such a breach is therefore sufficiently arguable to debar Guinness from obtaining an injunction. The trial court's conclusion that Guinness was not substantially likely to prevail does not, of course, prevent Guinness from succeeding on the merits after a full trial. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981).

### IV.

The compilers of the Guinness Book of World Records may yet prevail in their action against their American licensee, but as the trial court found, they have failed to establish their right to a preliminary injunction. This is entirely consistent with the purpose of injunctive relief, since Sterling's publication of the 1984 record book maintains a status quo unbroken since 1961 until the underlying contract dispute can be

resolved. This principle has in the past been invoked by Guinness to its advantage. *See Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir.1980) (mandatory injunction issued to maintain status quo pending resolution of distributorship termination dispute).

The Guinness Book of World Records lists the highest contract damage award ever obtained as $1.7 million. We express no view as to the accuracy of this "world record," but this 1932 British award is an indication of the magnitude of what is at stake in commercial disputes. Confronted with a complicated mercantile litigation involving multi-million dollar contracts, and in the absence of any showing of the prospect of irreparable injury, a district court is well advised to maintain the status quo pending resolution of the issue. *See, e.g., Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.1969), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Accordingly, we affirm the district court's order denying Guinness's motion for a preliminary injunction.