**BIOSAFE–ONE, INC. and Christopher Jorgensen, Plaintiffs,**

v.

**Robert HAWKS et al., Defendants.**

**No. 07 Civ. 6764(DC).**

United States District Court,
S.D. New York.

Nov. 29, 2007.

Vikrant Pawar, Esq., Anthony Wilger, Esq., New York, NY, for Plaintiffs.

Lessler & Lessler, by Arthur Lawrence Lessler, Esq., South River, NJ, for Defendants.

## OPINION

CHIN, District Judge.

Plaintiffs Bio–Safe One, Inc. ("Bio–Safe"), an industrial-strength septic system cleaning products company, and Christopher Jorgensen ("Jorgensen"), Bio–Safe's owner, allege that defendants Robert Hawks ("Hawks"), Brad Skierkowski ("Skierkowski"), and their associated companies have engaged in federal copyright infringement, trade dress infringement, trademark infringement, trademark dilution, common law breach of fiduciary duty, and numerous other violations of New York statutory and common law.

Jorgensen met Hawks and Skierkowski in 2005 when he retained them as his mortgage brokers. The parties have vastly different accounts of what transpired between the inception of their relationship and the present. Plaintiffs allege that Hawks and Skierkowski misused Jorgensen's confidential information, which they obtained when they were his mortgage brokers, to launch their competitor business and website, newtechbio.com, which they purportedly copied directly from plaintiffs' website, biosafeone.com. Defen-

dants deny plaintiffs' allegations, and claim that the launch of their business and accompanying website do not violate federal or state law.

Specifically, plaintiffs allege that defendants misused Jorgensen's information to contact and steal plaintiffs' suppliers, customers, advertisers, and vendors, and to disparage and impersonate plaintiffs, damaging plaintiffs' goodwill and resulting in a decline in customers and sales volumes. Among plaintiffs' allegations are that defendants reviewed Jorgensen's bank statements to locate his Federal Express account number, which they then used to illegally acquire the contact information for plaintiffs' secret vendor, Novozymes, from Federal Express. Additionally, plaintiffs claim that Hawks received a list of IP addresses for individuals visiting bio-safeone.com under the false pretense that he would help Jorgensen stop a "click fraud" problem, and that Hawks instead used this list to identify plaintiffs' customers, contact them to solicit business, and pose as a Bio–Safe representative.

Plaintiffs further allege that defendants illegally appropriated large amounts of material from biosafeone.com for use on newtechbio.com, including text, photographs, pictures, drawings, graphics, and other material. Plaintiffs submitted two Digital Millennium Copyright Act ("DMCA") notices to defendants' web hosting companies, resulting in the shut-down of defendants' website, forcing them to host it overseas at a higher cost. Defendants argue that filing these notices violated the DMCA's prohibition against misrepresentation.

Plaintiffs now move under Federal Rule of Civil Procedure 65(a) for a preliminary injunction shutting down defendants' business and website; barring defendants from using plaintiffs' copyrighted materials, trademarks, and trade dress; barring defendants from further breaching their fiduciary duties; and prohibiting defendants from contacting plaintiffs' customers, suppliers, vendors, and advertisers. Defendants cross-move for a preliminary injunction prohibiting plaintiffs from further interfering with their website and an order to reactivate their website. The Court conducted an evidentiary hearing on October 2, 2007.

For the reasons set forth below, plaintiffs' motion is denied and defendants' motion is granted. Pursuant to Federal Rule of Civil Procedure 52(a), my findings of fact and conclusions of law follow.

## BACKGROUND

### A. *Findings of Fact*

#### 1. *Bio–Safe*

Since 2001, Bio–Safe has been selling industrial-strength septic cleaning products through its website, biosafeone.com. (Pl. Mem. at 2). This website is Bio–Safe's primary means of marketing its products to consumers. (Id.). Bio–Safe possesses a copyright registration for its website. (Compl.Ex.A).[1]

#### 2. *Jorgensen's Mortgage Application*

Jorgensen met Hawks and Skierkowski in 2005 when he was in the market for a "jumbo" mortgage and he identified them as mortgage brokers through an internet search. (Compl.¶¶ 33–34). Jorgensen retained them as his brokers, and the parties entered into a contract that provided that

---

1. I have cited to the verified complaint for certain background facts. *See Parke, Davis & Co. v. Amalgamated Health & Drug Plan, Inc.,* 205 F.Supp. 597, 601 (S.D.N.Y.1962) ("Where the pleadings are properly verified, they may serve the office both of pleadings and evidence on an application for a temporary injunction.").

Jorgensen's information would only be used for the processing of his mortgage application. (Pl.Ex.3). Hawks and Skierkowsky finalized one mortgage for Jorgensen during the course of their business relationship, which ended in late 2005. (Hawks Decl. ¶ 7).

At the outset of their relationship, Hawks and Skierkowski required that Jorgensen provide information regarding his personal and business finances to apply for his mortgage. (Hawks Decl. ¶ 5). Defendants requested and received Jorgensen's mortgage application, bank statements, and credit reports. (Tr. at 61–63; Hawks Decl. at 2).[2] Defendants did not receive customer or vendor lists for Bio–Safe. (Hawks Decl. at 2). Jorgensen was very "secretive" about his business and did not divulge—nor did defendants ask him to divulge—any substantive details regarding Bio–Safe. (Tr. at 64).

### 3. *Defendants Launch Newtechbio*

In April 2007, Hawks and Skierkowski launched an industrial-strength septic cleaning products company, Newtechbio, with a company website, newtechbio.com. (Hawks Decl. at 3). Newtechbio competes with Bio–Safe, offering similar products at similar prices and volumes. (Compl. ¶ 51). Defendants have no prior experience in the septic or chemicals industry. (*Id.* ¶ 52).

Defendants did not use Jorgensen's bank statements, credit card statements, or other financial or business records to contact and steal Bio–Safe's customers, suppliers, advertisers, or vendors. (*See* Compl. ¶¶ 53–57, 116–21; Tr. at 10–12). Defendants similarly did not disparage or impersonate plaintiffs.[3]

Prior to the filing of this lawsuit, defendants copied portions of their website from plaintiffs' website. (*Id.* at 66–67). While planning to launch newtechbio.com, Hawks reviewed competitors' websites, compiling a master document of text from those sites. (*Id.*). Hawks copied portions of the master document that contained material from biosafeone.com to newtechbio.com. (*Id.*).[4] Defendants copied no graphics or photographs from biosafeone.com, and these elements appear dissimilar to the plain eye.

Once this action was filed, Hawks immediately removed the text belonging to biosafeone.com from his website. (*Id.* at 67). Hawks changed the website at least a few days before August 21, 2007. (Hawks Decl. ¶ 8). There are certain words, phrases, and navigational elements—such as the term "shock" and a "frequently asked questions" section—that were not removed from defendants' website. The term "shock" is commonly used in the septic industry and appears on many industry websites. (*Id.* ¶¶ 17–18). Fre-

---

**2.** "Tr." refers to the transcript of the October 2, 2007 hearing.

**3.** Jorgensen's allegations are not credible, as they are based solely on his own hunches. Plaintiffs concede that it is mere speculation that defendants stole customer lists using Jorgensen's bank statements. (Tr. at 17–18). Bank statements plaintiffs provided to the Court do include entries of payments made to Novozymes, but the mere existence of such entries is insufficient to support the contention that defendants used them to identify and solicit Novozymes. (*See id.* at 12). I find

Hawks's testimony that he selected Novozymes as his supplier using an internet search credible. (*Id.* at 60). There is similarly no evidence that Hawks used the list of IP addresses provided by Jorgensen to identify plaintiffs' customers, contact them to solicit business, and pose as a Bio–Safe representative. (*See* Tr. at 49–51). I find Hawks's testimony that he used the IP addresses from Jorgensen only to help him alleviate his click fraud problem credible. (*Id.* at 82–83).

**4.** Hawks contends that he did so inadvertently.

quently asked questions sections appear on numerous websites. (*Id.* ¶ 62).

#### 4. *Web Traffic*

Defendants did not intentionally divert internet traffic intended for plaintiffs' website to their own by purchasing the Bio–Safe mark as a keyword with search engines.[5] Furthermore, defendants advised Yahoo.com to exclude the Bio–Safe name from future searches for their company, and Yahoo.com has provided a statement that defendants did not cause searches using Bio–Safe's name to direct results for newtechbio.com. (Def.Mem.Ex.L).

#### 5. *DMCA Notices*

On August 23, 2007, defendants' web hosting company shut down defendants' website upon receiving a DMCA notice from plaintiffs, pursuant to 18 U.S.C. § 512(c)(3), dated August 21, 2007, stating that defendants' website infringed on plaintiffs' copyright. (Pawar Cert. Ex. 12). Shortly thereafter defendants moved their website to a new domain with a new name, cloggeddrainfield.com. Plaintiffs submitted another DMCA notice to defendants' new hosting company, and the website was again shut down on August 27, 2007. (*Id.*). These notices were filed after defendants realized that portions of newtechbio.com had been copied from biosafeone.com and removed the copied portions from their website. (Tr. at 67). Defendants must now host their website outside the country at a significantly increased cost. (Hawks Decl. ¶ 51).

#### B. *Prior Proceedings*

This action was commenced by plaintiffs on July 26, 2007. Plaintiffs moved for a preliminary injunction on August 13, 2007.

On September 12, 2007, defendants filed a cross motion for preliminary injunction and order to reactivate their website. The Court conducted a hearing and heard argument on October 2, 2007. Three witnesses testified. I reserved decision.

### DISCUSSION AND CONCLUSIONS OF LAW

#### A. *Applicable Law for Preliminary Injunctions*

██ A preliminary injunction is "an extraordinary and drastic remedy that will not be granted absent a clear showing that the [moving party] has met its burden of proof." *Christie–Spencer Corp. v. Hausman Realty Co.*, 118 F.Supp.2d 408, 417 (S.D.N.Y.2000). To prevail on a motion for a preliminary injunction, the moving party must demonstrate (1) a threat of irreparable injury and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation, as well as a balance of hardships tipping decidedly in the moving party's favor. *See, e.g., Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997). Irreparable injury exists where, but for the granting of the preliminary injunction, it would be difficult or impossible to return the parties to the positions they previously occupied. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999).

██ A trial court has discretion to fashion a preliminary injunction that will preserve the status quo pending a trial on the merits. *Arthur Guinness & Sons, PLC v. Sterling Pub. Co.*, 732 F.2d 1095, 1099 (2d Cir.1984); *see also Grand Union*

---

**5.** Plaintiffs' claim that defendants did so is unsupported by any evidence. (*See* Compl. ¶¶ 98–108).

*Co. v. Cord Meyer Dev. Co.,* 761 F.2d 141, 147 (2d Cir.1985). The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and will not be disturbed on appeal absent a showing of abuse of discretion. *See Arthur Guinness & Sons,* 732 F.2d at 1095; *see also Wallikas v. Harder,* 78 F.Supp.2d 36, 39 (S.D.N.Y.1999) (citing *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990)).

### B. *Plaintiffs' Motion for Preliminary Injunction*

I now consider whether plaintiffs have met the standard for issuance of a preliminary injunction.

#### 1. *Irreparable Harm*

■ Irreparable harm is often presumed in copyright, trademark, and trade dress infringement cases. *Richard Feiner and Co. v. Turner Ent. Co.,* 98 F.3d 33, 34 (2d Cir.1996) ("When a plaintiff establishes a prima facie case of copyright infringement, irreparable harm is presumed."); *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 967–68 (2d Cir.1995) (same in trademark and trade dress context). The theory underlying this presumption is that it is difficult to remedy confusion in the marketplace by an award of damages. *Id.* The Court assumes plaintiffs have shown irreparable harm.

#### 2. *The Merits*

Plaintiffs have not demonstrated a probability of success on the merits of any of their claims. Their claims are considered in turn.

#### a. *Copyright Infringement*

#### i. *Applicable Law*

■ To succeed on a copyright infringement claim, plaintiffs must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir. 1985). The issuance of a certificate of registration for a copyright is prima facie evidence of the validity of the copyright. *See id.*

■ To satisfy the second element, the copyright owner must demonstrate "'(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.'" *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 110 (2d Cir.2001) (quoting *Hamil Am., Inc. v. GFI,* 193 F.3d 92, 99 (2d Cir.1999)). Actual copying may be established by either direct evidence of copying or circumstantial proof of copying, consisting of evidence that the alleged infringer had access to the protected work and "that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir.2003) (internal quotations omitted). The standard test for substantial similarity is whether an "'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Hamil Am.,* 193 F.3d at 100 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960) (L.Hand, J.)). Such a comparison "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." *Sandoval v. New Line Cinema Corp.,* 147 F.3d 215, 217 (2d Cir.1998). A court examines the works' total concept and feel. *Boisson*

*v. Banian, Ltd.,* 273 F.3d 262, 272 (2d Cir.2001).

■■■■ Critical to the issue of improper appropriation is whether the copied elements of the work are original and nontrivial. *See Feist Publ'ns,* 499 U.S. at 345, 111 S.Ct. 1282 ("The *sine qua non* of copyright is originality."). Not all copying of copyrighted material is an infringement of copyright, as there are some elements of a copyrighted work that are not protected, even against intentional copying. *Attia v. Society of N.Y. Hosp.,* 201 F.3d 50, 54 (2d Cir.1999). For example, a central tenet of copyright law is that only a copyright owner's particular expression of his or her idea is protected, not the idea itself. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.1992) ("What is protected is the original or unique way that an author expresses those ideas, concepts, principles or processes."). Copyright protection extends to choices of "selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity." *Feist Publ'ns,* 499 U.S. at 348, 111 S.Ct. 1282.

■■■■ Notwithstanding proof that copying occurred, copying that is so trivial as to not meet the substantial similarity test will be considered *de minimis* and not actionable. *Sandoval,* 147 F.3d at 217. The *de minimis* doctrine is "an important aspect of the law of copyright," as "[t]rivial copying is a significant part of modern life," and "[m]ost honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law." *On Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir.2001).

ii. *Application*

■■■■ Bio–Safe possesses a copyright registration for its website, entitling it to the presumption that its copyright is valid. Plaintiffs therefore meet the first element of their claim. As to the second element— "copying of constituent elements of the work that are original"—plaintiffs have demonstrated actual copying, but have failed to demonstrate a substantial similarity exists between Newtechbio's website and the protectible elements of Bio–Safe's website.

Moreover, although defendants admit to copying, albeit inadvertently, textual elements of plaintiffs' website, since the complaint was filed defendants have removed the copied portions from their website.

With respect to the substantial similarity prong, plaintiffs fail to establish that defendants' copying is illegal. Applying the "ordinary observer test," with the Court assessing the two works' total concept and feel, there is no substantial similarity. A side-by-side comparison simply does not prompt an ordinary observer to regard the aesthetic appeal of the websites as the same. Rather, it is difficult to detect any similarities. The arrangement, photographs, and graphics on the websites are decidedly dissimilar. The textual elements that remain similar on the websites, including minor phrasing and terminology, are so far spaced throughout that they are not noticeable.

■■■■ Furthermore, this remaining similar text does not contain protectible elements. Terms such as "shock," which plaintiffs argue are protectible (*see* Tr. at 36–38) are merely technical industry concepts that are widely used, as evidenced by their prevalence on industry websites,

and not original or unique expressions of those concepts. Even if these phrases and terminology were entitled to legal protection, the copying is minimal and trivial, rendering it *de minimis* and not actionable. Accordingly, plaintiffs have failed to demonstrate they will likely prevail on their copyright claim.

### b. *Trademark Infringement*

#### i. *Applicable Law*

To prevail on a trademark infringement claim, a plaintiff must prove (1) his mark is entitled to protection, and (2) defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir.2003); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir.1993). The second element, likelihood of confusion, is assessed using the *Polaroid Corp. v. Polarad Elecs. Corp.* test. 287 F.2d 492, 495 (2d Cir.1961). This test requires examining

> the strength of [the owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* This analysis is "not a mechanical measurement," and "a court should focus on the ultimate question of whether consumers are likely to be confused." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 119 (2d Cir.2001) (internal citations and quotations omitted).

#### ii. *Application*

Plaintiffs fail to demonstrate that "a significant number of consumers are likely to be confused." I examine the *Polaroid* factors in turn.

The plaintiffs demonstrate the strength of their mark. The strength of a mark is "its tendency to identify the goods ... sold under the mark as emanating from a particular, although possibly anonymous, source." *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960–61 (2d Cir.1996) (internal quotations and citation omitted). The strength of a mark depends on its inherent distinctiveness and its distinctiveness in the marketplace. *Brockmeyer v. Hearst Corp.*, 248 F.Supp.2d 281, 294 (S.D.N.Y.2003). The Bio–Safe logo and overall look and feel of the website identify the products sold as emanating from Bio–Safe.

As to similarity, a court considers "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." *Sports Auth.*, 89 F.3d at 962. The two marks are not similar enough in appearance to confuse consumers. As discussed above, a side-by-side comparison of the websites does not reveal strong similarities. The shapes of the logos, company names, color placement, navigation, organizational elements, and layout of the websites would not be confused by potential purchasers. This factor weighs against plaintiffs.

The "proximity of the products" factor examines "whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir.1988); *Clinique Labs. Inc. v. Dep Corp.*, 945 F.Supp. 547, 553 (S.D.N.Y.1996). In assessing commercial proximity, courts should compare all relevant aspects of the products, including style, price, intended uses, target clientele, and channels of dis-

tribution. *Brockmeyer,* 248 F.Supp.2d at 296. Plaintiffs have demonstrated that they and defendants are trying to reach the same market. Their products target the same clients, are for the same uses, are similar in price, and are both distributed primarily through the internet. This factor weighs in plaintiffs' favor.

■ The fourth factor considers whether the plaintiffs will "bridge the gap" and enter defendants' business. *Sports Auth.,* 89 F.3d at 963. Here, the parties compete in the same market. Therefore, the question of whether plaintiffs will "bridge the gap" is irrelevant. *Paddington Corp. v. Attiki Imps. & Distribs.,* 996 F.2d 577, 586 (2d Cir.1993) (likelihood of bridging the gap irrelevant where parties already compete in the same market).

■ The fifth factor, actual confusion, deals with "consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Auth.,* 89 F.3d at 963 (internal quotations and citation omitted). "It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion," and therefore the Second Circuit has "deemed evidence of actual confusion particularly relevant." *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141 (2d Cir.2003) (citations omitted). Plaintiffs' conclusory statements that consumers are confused do not prove actual confusion, and plaintiffs have cited no credible instances of actual confusion.[6] This factor weighs in defendants' favor.

■ The sixth factor examines defendants' good faith in adopting the mark, asking "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted). As discussed above, the Court finds that defendants did not act in bad faith. Plaintiffs' allegations that defendants acted in bad faith are conclusory and unsupported by evidence. This factor weighs in defendants' favor.

■ The seventh factor, quality of defendants' products, asks "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 398 (2d Cir.1995). Plaintiffs concede that they are unaware of the quality of defendants' products (*see* Pl. Mem. at 19) and present no evidence that defendants' products are inferior. The fact that defendants have less experience than plaintiffs is not alone sufficient to establish this element. This factor weighs in favor of defendants.

■ In evaluating the eighth factor, sophistication of the buyers, a court considers "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 390 (2d Cir.2005). The parties both market to ordinary consumers who likely know little about industrial-strength septic cleaning products. Therefore, the sophistication of the buyers weighs in favor of a likelihood of confusion.

**6.** Jorgensen's Declaration states that three emails from his customers indicating their confusion are included in plaintiffs' moving papers. (Jorgensen Decl. ¶ 17). It appears that only one of these emails is actually included—an email sent from John Howard to sales@biosafeone.com on September 20, 2007. Plaintiffs do not provide an affidavit from John Howard.

Overall, there is little likelihood of consumer confusion. The *Polaroid* factors weighing in favor of defendants, particularly the similarity factor, are stronger than those in favor of plaintiffs. Therefore, even assuming plaintiffs' mark is entitled to protection, they have failed to demonstrate they will likely prevail on their trademark infringement claim.

### c. Trade Dress Infringement

#### i. Applicable Law

 Trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 743 (2d Cir.1998) (internal citations and quotations omitted). The statutory protection afforded to trademarks extends to trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). To succeed on the merits of a trade dress infringement claim, a plaintiff must demonstrate "(1) its trade dress is distinctive and (2) there exists a likelihood of confusion between its product and the alleged infringer's product." *Forschner Group, Inc. v. Arrow Trading Co.,* 124 F.3d 402, 407 (2d Cir.1997). For trade dress to be deemed "inherently distinctive," it must serve as an "indication of origin," so that a consumer would "readily rely on it to distinguish it" from competitors. *Id.* at 407–08. The "confusion" prong is assessed using the *Polaroid* test.

#### ii. Application

 Plaintiffs are not likely to establish their trade dress infringement claim. Bio–Safe's trade dress is distinctive, because its website, brochures, and packaging do indicate that the products sold originate from Bio–Safe. As discussed above, however, plaintiffs have failed to establish a likelihood of confusion under the *Polaroid* test. The two sets of trade dress simply are not likely to cause consumer confusion as to their origin.

### d. Trademark Dilution

#### i. Applicable Law

The Federal Trademark Dilution Act "entitles the owner of a famous, distinctive mark to an injunction against the user of a mark that is 'likely to cause dilution' of the famous mark." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 477 F.3d 765, 766 (2d Cir.2007) (quoting 15 U.S.C. § 1125(c)(1)). "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c). The statute outlines factors to consider in assessing whether a mark has the requisite degree of recognition, including:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

*Id.* The statute recognizes two types of dilution: (1) tarnishment, which is the disparagement of the mark's reputation, and (2) blurring, which is the diminished ability of the mark to serve as a unique identifier of the plaintiffs' goods and services. *Id.*

#### ii. Application

 Plaintiffs have failed to demonstrate that their trademarks are famous within the meaning of the statute. Plaintiffs' mark has been in use for only five years. Furthermore, there is no evidence

presented that the reach of the advertising or publicity of Bio–Safe is broad, nor has evidence been presented that the amount, volume, and extent of sales under the mark is at a level that demonstrates the necessary degree of recognition by the general U.S. public. Plaintiffs' conclusory statements that Bio–Safe is well-known and highly regarded for having high quality products in the industry are insufficient. Because plaintiffs have failed to demonstrate their mark is famous, I need not reach the dilution prong.

### e. *Breach of Fiduciary Duty, Unfair Competition, and Misappropriation of Corporate Opportunities*

#### i. *Applicable Law*

■■■■ "In New York, it is well settled that a real estate broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal." *Dubbs v. Stribling & Assocs.*, 96 N.Y.2d 337, 728 N.Y.S.2d 413, 752 N.E.2d 850, 852 (2001). Breach is demonstrated by a failure to meet this duty. Plaintiffs bringing misappropriation and unfair competition claims must establish "some wrongful appropriation or use of the plaintiffs' intellectual property." *Dow Jones & Co., Inc. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 (2d Cir.2006); *see Roy Export Co. Establishment v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir.1982) ("An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property.")

#### ii. *Application*

■■■ Plaintiffs have presented insufficient evidence that defendants misappropriated Jorgensen's confidential information or failed to act in his best interest during the course of their broker/principal relationship. As previously noted, Jorgen-

sen's testimony that defendants used his bank statements, credit card statements, and other financial and business records to contact and steal customers, suppliers, advertisers, or vendors is not credible. Similarly, plaintiffs produce no convincing evidence that defendants disparaged · or impersonated plaintiffs. The mere fact that defendants · entered into the same business as Jorgensen eighteen months after the end of their broker/principal relationship is not evidence of wrongdoing. Accordingly, plaintiffs are not likely to prevail on their claims of breach of fiduciary duty, unfair competition, or misappropriation of corporate opportunity.

### 3. *The Balance of Hardships*

■■■ Plaintiffs have failed to demonstrate a likelihood of success on the merits for any of their claims. Accordingly, they have not met the first prong of the second element of the preliminary injunction standard. Even if the Court were to conclude that plaintiffs had demonstrated "sufficiently serious questions going to the merits to make them fair grounds for litigation," plaintiffs have also failed to demonstrate that the balance of hardships tips in their favor. Defendants have drastically altered their website since plaintiffs filed this action. No potentially offending material remains on their website. Shutting down newtechbio.com (and effectively closing defendants' business) would surely harm defendants to a greater extent than plaintiffs would be harmed absent the relief sought.

### C. *Defendants' Motion for Preliminary Injunction and Order to Reactivate Website*

I now consider whether defendants have met the standard for issuance of a preliminary injunction enjoining plaintiffs from further interfering with their website.

Defendants complain that after removing the portions of newtechbio.com that were inadvertently copied from biosafeone.com, plaintiffs caused their hosting company, Add2Net, Inc. d/b/a/ Lunarpages ("Add2Net"), to shut down defendants' website by submitting a DMCA notice that falsely stated that defendants' website was infringing. Plaintiffs also had defendants' second website, cloggeddrainfield.com, which was hosted by a different company, Godaddy.com, shut down with a DMCA notice. Defendants argue that plaintiffs knowingly misrepresented that defendants were infringing to both web hosting companies in violation of 17 U.S.C. 512(f), forcing defendants to host their website outside the country at a higher cost.

Defendants now ask the Court to preliminarily enjoin plaintiffs from interfering with the operation of defendants' website. Additionally, defendants request that the Court issue an order directing Add2Net to reactivate newtechbio.com.[7] I conclude defendants have met the requirements for issuance of a preliminary injunction and thus their motion is granted. Because defendants' website is not infringing, I will issue an order directing defendants' web hosting company to reactive their website.

### 1. *Irreparable Harm*

■■■ Defendants have demonstrated irreparable harm. Irreparable injury exists where, but for the granting of the preliminary injunction, it would be difficult or impossible to return the parties to the positions they previously occupied. *See Brenntag Int'l Chems., Inc.*, 175 F.3d at 249. A preliminary injunction is necessary to return defendants to the position they occupied before plaintiffs filed the DMCA notices with their web hosting companies,

as plaintiffs have demonstrated twice that they will submit notices even when defendants' website is not infringing. Defendants' website, while operational, is only hosted at a higher cost. Restoring their website with Add2Net will return them to the position they previously held and enjoining plaintiffs from further interfering will serve to prevent any further harm from occurring.

### 2. *The Merits*

Defendants argue that plaintiffs' actions violate the misrepresentation provision of the DMCA. I now discuss whether defendants would likely prevail on their claim.

### a. *Applicable Law*

The DMCA provides in relevant part:

Any person who knowingly materially misrepresents . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f). The case law in this circuit discussing this provision is sparse. Defendants have not cited any cases to support their argument that plaintiffs violated the statute.

### b. *Application*

■■■ Defendants have failed to present sufficient evidence that plaintiffs violated

---

**7.** Defendants do not request that the Court order Godaddy.com to reactivate clogged-
drainfield.com.

§ 512(f). The definition of the term "knowingly materially misrepresent" is key to analyzing defendants' claim. Defendants have not submitted any evidence that plaintiffs were aware or understood that they were misrepresenting the fact that defendants' website was infringing when they filed their notices. Plaintiffs have submitted ample evidence in their moving papers and by Jorgensen's testimony that they believed, and continue to believe, that defendants' website violated their copyright when they filed the notices. (*See e.g.,* Wilkens Decl. Exs. 1–9). Moreover, the statutory language specifically provides for the remedy of damages and makes no mention of injunctive relief.

### 3. *The Balance of Hardships*

 While defendants have not demonstrated their likely success on the merits, they have demonstrated sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping in their favor. To succeed on their claim, defendants need only prove plaintiffs knew defendants were not infringing when they submitted the DMCA notices. Defendants have not yet had the opportunity to fully develop this theory. *See Clemente Global Growth Fund, Inc. v. Pickens,* 705 F.Supp. 958, 971 (S.D.N.Y.1989) (noting that limited discovery counsels in favor of a finding of "sufficiently serious questions going to the merits" when a showing of balance of hardships tipping in party's favor is made). Portions of Jorgensen's testimony lacked credibility, and a fair issue exists as to whether his statements that newtechbio.com infringed when he sent the DMCA notices were intentionally and knowingly false. Furthermore, while it is true that if defendants' website is ordered restored their harm will be greatly reduced, if plaintiffs continue to send DMCA notices defendants will be burdened, financially and otherwise, with arranging for alternative companies to host their website outside the country. A preliminary injunction barring plaintiffs from sending additional DMCA notices, absent court approval, however, would impose little or no burden on plaintiffs.

### *CONCLUSION*

For the reasons set forth, plaintiffs' motion for a preliminary injunction is denied. Defendants' motion for a preliminary injunction is granted. As defendants's website does not contain any infringing material, Add2Net is ordered to reactivate defendants' website, newtechbio.com. Defendants shall submit a proposed order on notice.

SO ORDERED.