NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**UNITED TRADEMARK HOLDINGS, INC.,**
*Appellant*

**v.**

**DISNEY ENTERPRISES, INC.,**
*Appellee*

_____

2021-1056

_____

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 91221648, 91224985.

_____

Decided:  February 24, 2022

_____

ERIK PELTON, Erik M. Pelton & Associates, PLLC, Falls Church, VA, argued for appellant.

LINDA K. MCLEOD, Kelly IP, LLP, Washington, DC, argued for appellee.  Also represented by JASON JOYAL, DAVID MICHAEL KELLY, I.

_____

Before TARANTO, HUGHES, and STOLL, *Circuit Judges*.

TARANTO, *Circuit Judge*.

United Trademark Holdings, Inc. applied to the Patent and Trademark Office ("PTO") to register as trademarks TEEN TINKER BELL in standard characters and TEEN TINK in stylized characters with a crown above the letters. Disney Enterprises, Inc. ("Disney," used here also to cover related entities) opposed the registrations on the ground that United's marks were likely to cause confusion with several of Disney's registered marks, including a mark for TINKER BELL in standard characters. The PTO's Trademark Trial and Appeal Board sustained Disney's oppositions and refused to register United's marks. *Disney Enterprises, Inc. v. United Trademark Holdings, Inc.*, Opposition Nos. 91221648, 91224985, 2020 WL 3076003 (T.T.A.B. June 8, 2020) (*Board Op.*). We affirm.

I

A character named "Tinker Bell" originally appeared in several works by J.M. Barrie, including: (1) the play *Peter Pan*, first staged in 1904 and published in 1928, with Tinker Bell depicted as a beam of light with musical bells and chimes, and (2) the book *Peter and Wendy*, first published in 1911, with Tinker Bell described as a "fairy girl gowned in a skeleton leaf." *Board Op.* at *3; *see also* J.A. 6028; J.A. 6047. In 1939, Disney acquired exclusive rights to "make, reproduce, and exhibit animated cartoon motion pictures and engage in merchandising activities related thereto" based on Barrie's *Peter Pan*-related works. *Board Op.* at *3. In 1953, Disney released an animated film, *Peter Pan*, which featured the Disney-developed version of Tinker Bell as a major character. *Id.* at *3–4, *11; *see also* J.A. 703–04. In the years since 1953, Disney has re-released the original film several times and has released additional films in which Tinker Bell has appeared. *Board Op.* at *11; J.A. 419.

While United asserts (and Disney has not disputed) that, under copyright law, the Tinker Bell name and

character from Barrie's 1911 novel are already in the public domain in the United States, and the same will be true regarding the play beginning in 2023, United Br. 9 (citing J.A. 6515), United has not contended that Disney's Tinker Bell character is in the public domain for copyright purposes. As for trademark protection, which is what this case involves, Disney has used TINKER BELL as a mark in connection with dolls since 1994 and allegedly used TINK as a mark in connection with dolls since 2007. *Board Op.* at *11; J.A. 430–37. Among its many registered marks, Disney holds Registration No. 3,636,910, which is for TINKER BELL, as a standard character mark, for various goods, including dolls and mechanical toys. J.A. 2794–96. This mark is listed on the Principal Register without a claim of acquired distinctiveness under Lanham Act § 2(f), 15 U.S.C. § 1052(f). *Id.*; *see also Board Op.* at *8.

In 2013, United launched its Fairy Tale High collection of dolls, depicting "public domain characters from well-known fairy tales, including Snow White, Rapunzel, Belle, Sleeping Beauty, Little Mermaid, Alice in Wonderland, Tinker Bell and Cinderella" as teenagers. *Board Op.* at *4. United asserts that, for the Tinker Bell dolls and others, it retained some crucial defining elements of the public domain character but added features to change the traditional presentation, *e.g.*, non-traditional colored streaks in the dolls' hair, funky leggings, colorful makeup, and fashion-forward accessories. *Id.* United asserts that it has created its own version of Barrie's character, much as Disney did decades ago. *Id.*

On January 28, 2013, United filed an application, pursuant to Lanham Act § 1(a), 15 U.S.C. § 1051(a), to register TEEN TINK, stylized as shown below, without claiming color.

4      UNITED TRADEMARK HOLDINGS, INC v.
          DISNEY ENTERPRISES, INC.

J.A. 7056–62 (Application Ser. No. 85/833,851). United's application identified dolls in International Class 28—covering any dolls, not just those with the above-enumerated features—and claimed actual use of the mark in commerce in connection with the identified goods since at least January 1, 2013. J.A. 7057. On February 9, 2015, the PTO approved the mark for publication on the Principal Register, and the mark was published for opposition on March 24, 2015. J.A. 7050–51. Meanwhile, on February 12, 2015, United filed a second application, pursuant to Lanham Act § 1(b), 15 U.S.C. § 1051(b), to register TEEN TINKER BELL in standard characters. J.A. 7067–72 (Application Ser. No. 86/533,016). The application identified dolls in International Class 28—again, any dolls—and claimed a bona fide intent to use the mark in commerce in connection with the identified goods. J.A. 7070. On March 28, 2015, the PTO approved the mark for publication on the Principal Register, and the mark was published for opposition on May 26, 2015. J.A. 7063–64.

On April 23, 2015, Disney opposed the registration of United's TEEN TINK mark under Lanham Act § 2(d), 15 U.S.C. § 1052(d), on the ground of Disney's priority and the likelihood of confusion with approximately 30 Disney registered marks (as well as prior pre-registration use)—including Registration No. 3,636,910 for TINKER BELL. J.A. 41–45 (Opposition No. 91221648); J.A. 50–73 (First Amended Notice of Opposition, filed on Feb. 9, 2016). On November 23, 2015, Disney did the same for United's TEEN TINKER BELL mark. J.A. 46–49 (Opposition No. 91224985); J.A. 352–74 (First Amended Notice of Opposition, filed on Dec. 14, 2015). In response, United denied the crucial allegations in the oppositions, but it did not

file counterclaims to cancel any of Disney's pleaded registrations. J.A. 384–91 (Answer to Amended Notice of Opposition, filed on Dec. 17, 2015, for the TEEN TINKER BELL mark); J.A. 376–83 (Answer to Amended Notice of Opposition, filed on June 2, 2016, for the TEEN TINK mark); *see also Board Op.* at *1, *8. The oppositions were consolidated in March 2016. *Board Op.* at n.1.

On June 8, 2020, the Board issued its decision. After determining that Disney had standing to maintain its oppositions and that Disney's pleaded registrations had priority over United's, the Board found it sufficient to use the TINKER BELL mark in Disney's Registration No. 3,636,910 for its likelihood-of-confusion analysis, for which it followed the multi-factor approach set forth in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973). *Id.* at *4–6. The Board first found that the goods identified in the relevant registrations are "identical" and that, as a result, it "must presume that the channels of trade and classes of purchasers for these goods are the same." *Id.* at *6. The Board then found that "[c]onsidering both inherent and commercial strength," Disney's mark, "as applied to dolls, is entitled to an ordinary scope of protection on the spectrum of 'very strong to very weak.'" *Id.* at *7–13 (citation omitted). Next, the Board found both of United's marks "to be more similar than dissimilar [to Disney's], and to convey similar commercial impressions overall." *Id.* at *13–15. Finally, the Board found that the relevant market would include "ordinary consumers who may purchase dolls on impulse" and that consumers "are accustomed to encounter[ing] [Disney's] mark on a wide variety of goods and services" and "are likely to view [United's] teen-themed dolls as additional products from [Disney's] line of products and services." *Id.* at *16–17. With those factors all favoring Disney, and all other factors on which evidence was presented neutral, *id.* at *17–21, the Board sustained the oppositions "on the ground of priority and likelihood of confusion with the mark in

Registration No. 3,636,910" and refused registration of both of United's marks, *id.* at *21.

United timely appeals. This court has jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## II

On appeal, United challenges the Board's analysis regarding several *DuPont* factors, specifically: (1) the factors that assess the strength, and the attendant scope of protection, of Disney's TINKER BELL mark; and (2) the similarity of United and Disney's marks. The Board's conclusion regarding likelihood of confusion is a question of law that we review de novo. *QuikTrip West, Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1034 (Fed. Cir. 2021). We review the Board's factual findings as to each *DuPont* factor for substantial-evidence support. *Id.*; *see also Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 998 (Fed. Cir. 2020); *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1342 (Fed. Cir. 2004). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support the finding. *Juice Generation, Inc. v. GS Enters., LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015); *see also In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011) ("This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings."). Under this standard, we conclude that substantial evidence supports the Board's findings on the contested factors. In this case, once we affirm those findings, we have been presented no persuasive argument for drawing any conclusion different from the Board's on the ultimate question of likelihood of confusion or for otherwise reversing the Board's denial of registration.

## A

United challenges the Board's findings related to the strength of Disney's registered mark—specifically, the findings on the fifth *DuPont* factor ("[t]he fame of the prior

mark") and the sixth *DuPont* factor ("[t]he number and nature of similar marks in use on similar goods"). *DuPont*, 476 F.2d at 1361. Fame in the context of likelihood of confusion is assessed on a spectrum from very strong to very weak, and both the inherent or conceptual strength of the mark and the commercial or marketplace strength of the mark are to be considered. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353–54 (Fed. Cir. 2010); *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:80 (5th ed. Mar. 2022 Update) (hereinafter *McCarthy*). Evidence of third-party use of similar marks on similar goods can show that a mark is relatively weak. *See Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373–74 (Fed. Cir. 2015); *Juice Generation*, 794 F.3d at 1338–39; *see also* 4 *McCarthy* § 24:43.

Here, substantial evidence supports the Board's determination that Disney's mark was entitled to an ordinary scope of protection. *Board Op.* at *13. United may be correct that Disney's TINKER BELL mark is conceptually weak, albeit inherently distinctive, as the Board itself found. *Id.* at *10 ("On this record, we find [Disney's] inherently distinctive TINKER BELL mark to be highly suggestive of the dolls identified thereby, primarily inasmuch as the dolls depict the character TINKER BELL."). But the Board could reasonably find that the mark's commercial strength was strong enough to counteract any conceptual weakness, allowing the mark to be given an ordinary scope of protection. *See Chippendales*, 622 F.3d at 1353–54; *Board Op.* at *11 (finding Disney has used TINKER BELL on dolls since 1994—a finding uncontested on appeal by United); *id.* at *9–10, *12 (finding no evidence of widespread third-party registrations or use of TINKER BELL or TINK, or similar marks, in connection with dolls and related toys—another finding uncontested on appeal by United); *see also, e.g.*, J.A. 438–43 (uncontextualized

evidence of consumer exposure to Disney's Tinker Bell-related marks).

In response to the evidence of commercial strength, United points to the Board's finding that Disney had not proven its TINKER BELL mark to be famous for dolls specifically. *Board Op.* at \*12 (citing *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1375 (Fed. Cir. 2002)). We need not decide whether a focus on dolls specifically for the fame-strength analysis is appropriate. *See Recot, Inc. v. Becton*, 214 F.3d 1322, 1327–28 (Fed. Cir. 2000); 4 *McCarthy* § 24:43. It is sufficient here that a mark does not have to be famous to be commercially strong. *See FocusVision Worldwide Inc. v. Information Builders, Inc.*, 859 F. App'x 573, 577–78 (Fed. Cir. 2021); *see also* United Reply Br. 5 (conceding this point). And the Board clearly found commercial strength sufficient to overcome any conceptual weakness, with sufficient support in the evidence. We affirm the Board's grant of an ordinary scope of protection to Disney's TINKER BELL mark.

B

The first *DuPont* factor concerns "[t]he similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. The degree of similarity can then be significant in the overall assessment of likelihood of confusion based on consideration of all the *DuPont* factors. For example, "[a]s a mark's fame [or strength] increases, the [Lanham] Act's tolerance for similarities in competing marks falls." *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992); *see also Juice Generation*, 794 F.3d at 1338–39 ("The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion . . . ."). At the same time, "[w]hen marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877

(Fed. Cir. 1992).  Here, substantial evidence supports the Board's determination of similarity of both of United's marks to Disney's TINKER BELL mark—especially since Disney's mark was properly accorded ordinary scope, *see supra* Section II.A, and the marks would both appear on dolls, *see Board Op.* at \*6 (not contested on appeal).

1

United's TEEN TINKER BELL mark differs from Disney's TINKER BELL mark (both in standard characters) only in the addition of TEEN in front of TINKER BELL. As United's mark encompasses Disney's, it was reasonable for the Board to find that the two marks are similar in sound and appearance.  *See Board Op.* at \*13.  It was likewise reasonable for the Board to find that the two marks have similar connotations and give similar commercial impressions.  As the Board noted, United provided no evidentiary support for its theory that Disney's TINKER BELL mark evokes for consumers the public domain Tinker Bell character, instead of the version associated with Disney for decades.  *Id.* at \*14.  As a result, it was reasonable for the Board to conclude that both United's and Disney's marks would connote Disney's version of the Tinker Bell character, with United's mark connoting Disney's Tinker Bell character specifically in her adolescent years.  *Id.*  Even if the ages suggested by TINKER BELL and TEEN TINKER BELL might be viewed as different, United Br. 22–23, the Board could reasonably find that the evidence did not establish a difference that would undermine the common association with Disney's Tinker Bell character or, therefore, defeat the overall similarity of the marks.  We note that United clarified at oral argument in this court that it was not contending that it had established such a difference based on its TEEN TINKER BELL being part of its TEEN [CHARACTER NAME] collection of marks.  Oral Arg. at 10:00–31.

United suggests that the addition of the single word TEEN (especially as the first word) should suffice to

prevent a finding of similar marks.  But while sometimes the first word can be of special importance, *see, e.g.*, *Palm Bay Imports, Inc. v. Veuve Cliquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (analyzing VEUVE CLICQUOT versus VEUVE ROYALE); *Century 21 Real Estate*, 970 F.2d at 876 (analyzing CENTURY 21 and CENTURY LIFE OF AMERICA), the significance of a first word depends on the particular context.  Here, the Board had ample reason to find similarity despite the first word of United's mark.  The lead-word TEEN in United's mark is a descriptive or suggestive adjective that merely qualifies and characterizes the rest of United's mark, which is identical to Disney's.  *Board Op.* at *13; *see also* J.A. 2756–78, 3733–873 (various pieces of evidence showing "teen" used to describe "dolls").  And the remainder of the mark was sufficiently shown to connote Disney's character distinctively, not the public domain character, and to not be "subject to widespread third-party use."  *Board Op.* at *12, *14.

This case is therefore materially different from *Citigroup Inc. v. Capital City Bank Group, Inc.*, where we affirmed the Board's finding of no likelihood of confusion between CAPTIAL CITY BANK and CITIBANK, in part because of the distinctive spelling of CITI and because "third-party usage of marks ending in 'City Bank' suggests that the public is sensitive to differences in the first word of the name of a bank."  637 F.3d 1344, 1349–50, 1352 (Fed. Cir. 2011).  This case is also materially different from *In re Hearst Corp.* for substantially the same reasons.  982 F.2d 493 (Fed. Cir. 1992).  In *Hearst*, we reversed the Board's refusal to register the mark VARGA GIRL for calendars, which the Board found was likely to be confused with the extant mark VARGAS for calendars (both of which were related to drawings by the same artist, Alberto Vargas).  *Id.* at 493–94.  We held that, even though GIRL was merely descriptive, "[t]he appearance, sound, sight, and commercial impression of VARGA GIRL derive significant contribution from the component 'girl,'" such that the two marks

UNITED TRADEMARK HOLDINGS, INC v.                    11
DISNEY ENTERPRISES, INC.

were not likely to be confused. *Id.* at 494. As *Hearst* recognizes, these types of determinations are heavily fact dependent, *see id.* at 494 n.2, and here the added component TEEN is not just descriptive or suggestive, it is an adjective used such that it reinforces and directs emphasis to the rest of the mark.

United notes the Board's decision in an ex parte proceeding, *In re United Trademark Holdings, Inc.*, Serial No. 85706133, 2014 WL 5463042 (T.T.A.B. Oct. 9, 2014), concerning another of United's applications for registration. United Br. 23–24. That Board decision, besides not being precedent for us, involved materially different facts from those present here. There, without Disney's participation, the Board found ZOMBIE CINDERELLA and WALT DISNEY'S CINDERELLA to leave different impressions because "ZOMBIE CINDERELLA creates a 'cognitive dissonance,' involving an uneasy mixture of innocence and horror," whereas WALT DISNEY'S CINDERELLA "creates an impression of prettiness and goodness." *Id.* at *6–8. No such cognitive dissonance is introduced by prepending TEEN to TINKER BELL. The Board in the ZOMBIE CINDERELLA proceeding also found CINDERELLA itself not to be a strong source identifier for Disney, given use of the name by many others over the years. *Id.* at *4–6. In the present case, given quite different marketplace facts, the Board found TINKER BELL a commercially strong source identifier for Disney. *Board Op.* at *8, *12.

2

We also affirm the Board's key determinations regarding United's TEEN TINK mark. Because the rights associated with a mark in standard characters (like Disney's TINKER BELL registered mark) reside in the wording and not in any particular display, the Board properly undertook the similarity comparison with TEEN TINK by considering Disney's TINKER BELL mark as if displayed in the font, style, and size found in United's TEEN TINK application. *See In re Viterra Inc.*, 671 F.3d 1358, 1363 (Fed. Cir. 2012).

As a result, the differences between Disney's TINKER BELL mark and United's TEEN TINK mark amount to: (1) the use of TEEN; (2) the contraction of TINKER BELL to TINK; and (3) the crown placed above TEEN TINK. But none of those differences, even considered together as a whole, undermine the reasonableness of the Board's finding of similarity.

First, for the reasons already discussed, the Board permissibly determined that the addition of TEEN does not significantly alter the appearance, sound, connotation, and commercial impression of United's mark as compared to Disney's mark. *See supra* Section II.B.1. Second, the Board permissibly determined that the contraction of TINKER BELL to TINK also did not effect a material change, noting that Tink has been commonly used as a nickname for Tinker Bell since Barrie's works. *Board Op.* at \*14; *see also* J.A. 55–58 (Disney's evidence of its own use of the nickname Tink). Finally, the Board permissibly determined that the crown in United's mark did not call for a different result, noting that it is small and less significant than the verbal portions of the mark, working to "essentially creat[e] a frame for the wording and draw[] additional attention thereto." *Board Op.* at \*15. Based on this evidence, even if United is correct that the nickname TINK strengthens the adolescent impression, and the crown adds the impression of royalty, *see* United Br. 20, 22, the Board nevertheless could reasonably determine that the marks, on the whole, are similar.

## C

United does not present any argument for why there is no likelihood of confusion, as a matter of law, if, as we have concluded, the Board's findings on the contested *DuPont* factors should be affirmed. United does contend that we should be wary of "ruling for Disney in this case," as it amounts to letting Disney "prolong its copyrights in a fictional, public domain character" through trademark law— and, in turn, prevents United from building on the public

domain to create its own version of the Tinker Bell character.  United Br. 24–26.  But this is not an argument about the application of the ordinary Lanham Act standard of likelihood of confusion.  It is a suggestion that the ordinary statutory standard should be displaced.  We see no adequate basis for adopting this suggestion here.

United has failed to explain how its copyright-rooted argument could properly lead to our disturbing the Board decision here.  Because United asserted no counterclaims against Disney's marks, the only decision before us is the Board's refusal to register United's marks, which also include the name of a public domain character.  United's concern with extension of copyright via trademark protection thus would point to *affirming* the Board's denial of registration here.  And to the extent that United invokes this concern to argue that trademarks referring to public-domain character names "must be inherently weaker" under the *DuPont* factor 4 analysis, Oral Arg. at 27:02–28, it has not explained how the weakness could go beyond the conceptual-strength component.  But such an approach would not have changed the outcome here, because the Board already found Disney's mark to be conceptually weak—then permissibly found that Disney's mark is commercially strong enough to overcome such conceptual weakness.  *See supra* Section II.A.

Moreover, given these findings, United has not shown that Disney's trademark protection in this particular matter constitutes a "'misuse or overextension' of trademark and related protections into areas traditionally occupied . . . by copyright."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 19 (2001)).  Copyright and trademark law have not been treated as "mutually exclusive" in these circumstances:

> The fact that a copyrightable character or design has fallen into the public domain should not preclude protection under the trademark laws so long

as it is shown to have acquired independent trademark significance, identifying in some way the source or sponsorship of the goods. . . . A character deemed an artistic creation deserving copyright protection . . . may also serve to identify the creator, thus meriting protection under theories of trademark or unfair competition . . . . Indeed, because of their special value in distinguishing goods and services, names and pictorial representations of characters are often registered as trademarks under the Lanham Act.

*Frederick Warne & Co. v. Book Sales Inc.*, 481 F. Supp. 1191, 1196–97 (S.D.N.Y. 1979) (Sofaer, J.) (citations omitted); *see also Munhwa Broad. Corp. v. Solafide, Inc.*, No. 07-699, 2007 WL 2667451, at \*4 (C.D. Cal. 2007); *Wyatt Earp Enters., Inc. v. Sackman, Inc.*, 157 F. Supp. 621, 624–25 (S.D.N.Y. 1958); 1 *McCarthy* § 6:5 & n.10. United itself recognizes that "creative works can be protected as trademarks when they identify the origin of the producer of services or tangible goods," United Br. 25, and it has not explained how Disney's use of its TINKER BELL mark—found still to be a source-identifier for Disney, *Board Op.* at \*8, \*12—is a misuse or extension of a trademark.

### III

For the foregoing reasons, we affirm the Board's decision refusing to register United's marks.

**AFFIRMED**